UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CONNOR CHANNING MCCOWAN,

            Petitioner,                 Case No. 1:16-cv-1310

      v.                     Honorable Janet T. Neff

TONY TRIERWEILER,

            Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Connor Channing McCowan is incarcerated with the Michigan Department of Corrections at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan. On October 15, 2013, an Ingham County Circuit Court jury found Petitioner guilty of second-degree murder, MICH. COMP. LAWS § 750.317.   On November 6, 2013, the court imposed a sentence of 20 to 40 years' imprisonment.  On November 9, 2016, Petitioner, through counsel, filed his habeas corpus petition raising two grounds for relief, as follows:

    I.    WHETHER PETITIONER McCOWAN WAS DENIED HIS FEDERAL DUE PROCESS RIGHT TO PRESENT A DEFENSE (U.S CONST. AMENDS. VI & XIV) WHEN THE TRIAL COURT PROHIBITED PETITIONER FROM PRESENTING RELEVANT EVIDENCE CONCERNING HEAD INJURIES AND EXPERT TESTIMONY REGARDING THAT EVIDENCE, AND WHEN THE TRIAL COURT REFUSED TO ALLOW EVIDENCE OF THE CHARACTER OF THE DECEASED FOR AGGRESSION, EVIDENCE CRITICAL TO PETITIONER'S DEFENSE.  WHETHER THE STATE APPELLATE COURT RULINGS ON THIS ISSUE WERE BASED ON AN UNREASONABLE DETERMINATION OF FACT, AND WHETHER THOSE RULINGS CONSTITUTE AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT, REQUIRING THE GRANT OF THE WRIT.

II.    WHETHER PETITIONER McCOWAN WAS DENIED HIS RIGHT TO REMAIN SILENT (U.S.CONST. AMEND. V), AND HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION (U.S. CONST. AMENDS. V & XIV), WHEN THE PROSECUTOR ENGAGED IN SEVERE OUTCOME-DETERMINATIVE MISCONDUCT BY IMPROPERLY DISPARAGING PETITIONER'S CONSTITUTIONALLY PROTECTED RIGHTS, AND BY SUGGESTING THAT PETITIONER McCOWAN'S EXERCISE OF HIS RIGHT TO SILENCE, THROUGH HIS INVOCATION [OF] HIS RIGHT TO COUNSEL AT ARREST, SHOWED THAT HE WAS GUILTY.   WHETHER THE STATE APPELLATE COURT RULING ON THIS ISSUE WAS BASED ON AN UNREASONABLE DETERMINATION OF FACT, AND WHETHER THAT RULING CONSTITUTES AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT, REQUIRING THE GRANT OF THE WRIT.

(Pet., ECF No. 1, PageID.12.)  Respondent has filed an answer to the petition (ECF No. 6), stating that the grounds should be denied because they lack merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are without merit.  Accordingly, I recommend that the petition be denied.

**Discussion**

I.    Factual allegations

The conviction at issue in the instant case arises out of a fight on February 23, 2013, between two friends, Petitioner and Andrew Singler, which resulted in the death of Mr. Singler. Petitioner was charged with open murder.  Following a preliminary examination held on April 18, 2013, Petitioner was bound over for trial in the Ingham County Circuit Court.  (Prelim. Exam. Tr., ECF No. 7-4.)

Tyler Aho testified that he was one of three roommates who lived in a third-floor apartment on Rothbury Way in Meridian Township.  One roommate was Shay McCowan, Petitioner's sister, and the other was Andrew Singler.  (T. Tr. II, ECF No. 7-9, PageID.524-525.)

2

Each roommate had his or her own room.  (*Id.*, PageID.525.)  Aho met Singler through Shay, because he and Shay worked together at Wings Over East Lansing.  Shay and Singler had been dating for about two years, though they fought periodically.  (*Id.*, PageID.526-527.)  Aho came to know Petitioner, who came to the apartment frequently.  Petitioner and Singler were good friends. (*Id.*, PageID.527.)  Singler was like a big brother to Petitioner.  (*Id.*, PageID.550.)

    Aho left the apartment at about 4:45 p.m. on Saturday, February 22, 2013, in order to go to work.  When Aho left, Singler was in the apartment, and Shay was already at work.  (*Id.*, PageID.528.)  At about 2:50 a.m. on February 23, 2013, not long before the end of Aho's work shift, Singler sent Aho a text, indicating that he needed a ride because Shay had lost his keys.  Aho left work, picked up Singler, and took him home.  Singler was angry and intoxicated.  Aho unlocked the apartment doors and let Singler in shortly after 3:00 a.m., and he then returned to work to clock out at about 3:30 a.m.  (*Id.*, PageID.529.)  When Aho arrived back at the apartment at about 3:50 a.m., he did not see Singler inside.  Aho looked in all rooms except Shay's, which he didn't enter because the door was closed.  (*Id.*, PageID.530-531.)  Aho sent a text to Singler, asking where Singler was.  Aho was in the kitchen when the door buzzer rang.  Assuming that it was Singler or Shay, Aho buzzed to let the caller enter the building.  At that point, Singler came out of Shay's room and walked toward the front door.  (*Id.*, PageID.532.)  Singler looked out the peephole and then opened the door.  (*Id.*, PageID.532-533.)  According to Aho at trial, Petitioner was standing outside the door holding an open flip-blade hunting knife.  (*Id.*, PageID.534.) Petitioner looked unhappy, but he was calm.  Both Singler and Petitioner looked ready for a confrontation.  Aho stepped in front of Singler, holding him back. One of the two men said, "[A]re we going to do this[?]"  (*Id.*, PageID.535-536.)  Singler pushed past Aho, and Singler and Petitioner went at each other, grappling just inside the apartment door.  (*Id.*, PageID.536-537.)

Singler punched Petitioner in the face with a solid punch.  Petitioner stumbled back and partially through the doorway, looking briefly stunned.  (*Id.*, PageID.537-538, 554.)  Petitioner came back inside, and the two went at each other again, Singler placing his hands on Petitioner's shoulders. Petitioner stabbed Singler multiple times in the chest with the knife.  (*Id.*, PageID.538.)  Aho testified that the stabbing did not appear to be accidental.  Singler fell to the wall, screaming, "Oh, God."  Petitioner saw Singler bleeding from the wound and moaning, but he did not check on Singler.  (*Id.*, PageID.539.)  Petitioner looked at Aho and shrugged his shoulders, still holding the knife.  Aho held his hands up.  Petitioner then walked out the hallway toward the parking lot.  Aho put pressure on Singler's wound.  Singler stated that they needed to go to the hospital.  Aho placed Singler over his shoulder and took him to Aho's car.  (*Id.*, PageID.540.)  Aho drove very quickly to the hospital, while Singler moaned and gradually lost consciousness.  Aho called 911 as he was driving.  They arrived at the hospital within 10 minutes of reaching the car.  (*Id.*, PageID.542.) Aho acknowledged that he grew a number of marijuana plants in his closet.  He testified that he did not use marijuana, though Singler, Shay and Petitioner all used marijuana.  Aho stated that he hesitated calling 911 from the apartment because of the presence of the marijuana plants.  (*Id.*, PageID.543-544.)  Indeed, he admitted that he lied when he told the 911 operator that he had arrived home to find Singler stabbed, and he further admitted that he was reluctant to provide the address.  (T. Tr. III, ECF No. 7-10, 574.)

According to Aho, Lansing police officers were at the emergency room when he arrived.  He told the officers what had happened, and he identified Petitioner as the attacker.  Aho was placed in the back of a Meridian Township police vehicle, where he was held for a couple of hours and interviewed by a female township officer.  He was later transported to the Meridian Township Police Department, where he was again interviewed.  (T. Tr. II, ECF No. 7-9,

PageID.545; T. Tr. III, ECF No. 7-10, PageID.575.)  While he was in the police cruiser, Aho received many calls from Petitioner, which a male police officer told him not to answer.  (T. Tr. III, ECF No. 7-10, PageID.575-576.)  At the time he was interviewed by the township officer and the detective, Aho did not say that Petitioner had the knife in his hand when the door was opened. Aho only told Sgt. McGready and the prosecutor that Petitioner was holding the knife two or more days later.  Aho explained that it had taken him some time to digest what had happened and to remember certain details.  (T. Tr. II, ECF No. 7-9, PageID.546-547.)  On cross-examination, Aho explained that he was not initially certain whether Petitioner had the knife in his hand.  He admitted that he told the officers on the first day that Petitioner did not have the knife in his hand when he arrived, and he admitted that his transcribed and signed statement did not indicate that Petitioner had the knife in his hand.  (*Id.*, PageID.548.)

On the third day of trial, the prosecution sought to suppress a portion of the recorded police interview of Mr. Aho, during which Aho was using his phone, ostensibly for the purpose of removing drug sale information.  The court denied the motion, allowed the entire interview, but ruled that the defense could not question Aho about what he was doing.  (T. Tr. III, ECF No. 7-10, PageID.568-569.)  The entire 40-minute interview was played for the jury.  (*Id.*, PageID.570.)

Meridian Township Police Officer Rebecca Payne testified that she received a police call that there had been a stabbing and that the roommate was driving the victim to Sparrow Hospital.  She drove directly to Sparrow Hospital, arriving at 4:26 a.m.  Officer Lofton also was dispatched.  She was met in the parking lot by Lansing Police Officers Kraft and Lamakowski. The victim had already been taken into the emergency room.  Aho, who was at that time in the rear of Lamakowski's cruiser, gave Payne the name and description of the suspect, Petitioner.  (*Id.*, PageID.581.)  Within five or ten minutes, Aho was placed in the back of Payne's vehicle, which

has a recording device, and she was wearing a microphone.  Payne sat in the front of the vehicle and interviewed Aho.  Payne never noticed Aho use his phone and never heard it ring.  (*Id.*, PageID.582.)  Aho told her substantially the same story previously recited, though he indicated that Petitioner had used an underhand motion to strike Singler with the knife and that he did not know where the knife came from before it was used.  Payne stated that Aho told her that the knife may only have been used once.  (*Id.*, PageID.583.)  Payne examined Aho for injuries, to confirm his story.  Aho did not appear to be intoxicated and seemed coherent.  (*Id.*, PageID.584.)  According to Payne, after questioning Aho for about an hour, she left him in the vehicle for at least another hour while she spoke with hospital and morgue personnel.  She did not tell Aho that Singler had died.  (*Id.*, PageID.585.)  Payne testified that, if she had known of the calls from Petitioner, she would have been interested. (*Id.*, PageID.586.)

Officer Curtice Squires of the Meridian Police Department testified that he was dispatched to the scene of the stabbing and entered the apartment with Officer Harvey.  (*Id.*, PageID.587.)  He and Officer Squires later went to the address given them for Petitioner, as did other officers.  (*Id.*, PageID.588.)  Squires and Harvey spoke with Judy McCowan.  When Petitioner and his father returned to the house in a white Ford Explorer about 30 minutes later, Squires ordered Petitioner out of the vehicle.  He observed no injuries to Petitioner, and Petitioner did not appear disoriented.  (*Id.*, PageID.589-590.)  Squires handcuffed Petitioner and placed him in Officer Loughton's vehicle.  Squires testified that Petitioner was deadpan and requested an attorney. (*Id.*, PageID.590.)  The court sua sponte instructed the jury that Petitioner had a right to request an attorney before questioning.  Squires indicated that he then searched the vehicle with Randall McCowan's consent.  Randall McCowan handed Squires his cell phone, which was in the vehicle.  (*Id.*)  During this time, Judy McCowan was trying to reach her daughter Shay, and she

was finally successful at about 8:00 a.m.  Squires testified that he spoke to Shay to see if she was all right.  He described Shay as somewhat "nonchalant."  (*Id.*, PageID.591.)

Meridian Officer John Wicks worked the day shift on February 23, 2013.  He responded to Petitioner's address at about 5:45 a.m.  (*Id.*, PageID.593.)  He did not note an injury to Petitioner's eye.  Petitioner was calm in his demeanor.  (*Id.*, PageID.594.)  The court sustained a defense objection to whether Petitioner talked to Officer Wicks about his injuries or requested medical attention, struck certain questions and responses, and instructed the jury that, because Petitioner had already asked for an attorney, he was not required to give an answer.  (*Id.*, PageID.595.)

On the fourth day of trial, the court permitted the introduction of texts between the victim (Singler), Shay and Petitioner that had circulated between all three of them, including Shay's message that Singler had broken her rib.  The court did not allow introduction of the messages that were just sent between Shay and Singler.  (T. Tr. IV, ECF No. 7-11, PageID.598-599.)

Meridian Township Detective Edward Besonen testified that he obtained search warrants of both the victim's residence and that of Petitioner.  When Shay arrived at the police station at 10:15 a.m., Besonen interviewed her.  Besonen asked about messages exchanged with Petitioner, and Shay showed him some.  She then reluctantly turned over her phone.  Shay was upset at the beginning of the interview, but became calm as it went on.  (*Id.*, PageID.601.)  Three days later, in response to information provided by Petitioner's family, Besonen walked along Park Lake Road and found a folding knife next to the curb that appeared to have blood stains on it.  (*Id.*, PageID.603.)  The knife was submitted for forensic testing.  Besonen searched dumpsters along a path leading between the scene of the incident and Petitioner's home, but he did not discover the

clothing that Aho and the gas station video showed Petitioner as wearing.  (*Id.*, PageID.604-606.)
The McCowan's provided the clothing to the police a couple of days later.  Three days after the
incident, Aho contacted the police to let them know that he remembered seeing Petitioner when
the door opened, standing on the other side of the door with an open knife in his hand.  (*Id.*,
PageID.606-607.)

Meridian Police Officer Greg Harris testified that he collected a shower curtain
from the McCowan home, which preliminarily showed the presence of DNA.  (*Id.*, PageID.608.)
Harris also collected buccal swabs from Petitioner, including a swab from his hands.  In addition,
he collected the cell phones of Tyler Aho, Andrew Singler, Shay, and Petitioner.  He obtained a
search warrant for the phones and performed a forensic examination on them, producing reports
of the message streams.  (*Id.*, PageID.609.)  Harris then read a string of texts between Shay and
Petitioner and Singler and Petitioner.  (*Id.*, PageID.610-614.)  Shay informed Petitioner that
Singler had broken her rib and her back.  Petitioner offered Shay a ride, which she declined.  (*Id.*,
PageID.610.)  After Shay complained that Singler kept calling her, Petitioner texted that he was
going back to bed because he was sick and had to work in the morning.  (*Id.*, PageID.611.)  Singler
wrote Petitioner, demanding to know why Petitioner had not returned his call and calling him
offensive names.  Petitioner responded that Singler had woken him at 3 a.m., that Petitioner had
offered to pick Singler up and to help find Shay, that he had told Singler where Shay was, and that
Singler should not be burning bridges with Petitioner.  Singler wrote an offensive message to
Petitioner, and Petitioner responded similarly, saying that he would have no problem finding
Singler and "whoop[ing]" him.  (*Id.*, PageID.611-612.)  Singler mocked Petitioner, and Petitioner
threatened to beat Singler up if he did not apologize.  The mutual threats, offensive language,
mockery, and goading continued, with Singler encouraging Petitioner to come over and fight.

From the location of the cell phone signal, the messages appear to have been sent as Petitioner left the house, went to the gas station and proceeded to Singler's apartment.  (*Id.*, PageID.612-616.) Harris testified that a significant majority of the texts showed that Petitioner was still at home, notwithstanding threats to come beat up Singler.  (T. Tr. V, ECF No. 7-12, PageID.627-629.)  In addition, Singler made three calls to Petitioner between 2:45 a.m. and 3:15 a.m.  (*Id.*, PageID.628.) After the fight, Petitioner called Tyler Aho 24 times, starting from 4:10 a.m. to 4:21 a.m., all from a location close to the apartment, six of which came in while Aho was calling 911.  (*Id.*, PageID.629.)

Trauma Surgeon Dr. Benjamin Mosher testified that, when he first saw Singler, he could detect no vital signs.  Singler had wounds in his left chest and his right arm.  The medical team inserted a plastic tube into Singler's trachea, inserted an IV into his tibia, and performed a thoracotomy by which they opened his chest to look at his heart.  Mosher found that the heart had been lacerated.  (*Id.*, PageID.637.)  Once they opened the chest, they found a large amount of blood, probably between one and three liters.  They clamped the hole, gave medication and blood products, and transported Singler to the operating room.  By that time, Singler had a heartbeat. Once Singler got to the operating room, his heart stopped again.  Singler was declared dead at 5:15 a.m.  (*Id.*, PageID.638.)  Mosher testified that, even if an ambulance had been called, the ambulance personnel could not have done anything to save Singler's life.  (*Id.*, PageID.639.)

Forensic Pathologist John Bechinski performed the autopsy of Singler.  (*Id.*, PageID.641.)  Singler was six feet tall and 171 pounds after death.  (*Id.*, PageID.642.)  The knife entered the heart through the fourth intercostal space, between the ribs, front to back, left to right, and slightly upward.  (*Id.*, PageID.644.)  The wound in the right arm did not hit the brachial artery. (*Id.*, PageID.645.)  The bodily fluids collected by Dr. Bechinski contained traces of marijuana and

fentanyl and showed a blood alcohol content of .124 percent, a urine alcohol concentration of .226 percent, and a vitreous alcohol level of .185 percent, some eight hours after the fight and injury, during which the alcohol would have degraded some.  (*Id.*, PageID.647, 649, 652.)  Dr. Bechinski testified that pictures of Petitioner showed an abrasion to Petitioner's outer left eyebrow and discoloration of the upper eyelid caused by blunt force trauma consistent with being punched.  (*Id.*, PageID.647.)  Dr. Bechinski confirmed on cross-examination that it was impossible to say how much force was used to inflict Singler's wound and that it could have even occurred from someone leaning into the blade.  (*Id.*, PageID.651.)

Shay McCowan, Petitioner's older sister, testified that, on the date of Singler's death, she shared an apartment with Singler and Aho.  (*Id.*, PageID.654.)  Petitioner had graduated high school the year before Singler's death, where he had engaged in football, wrestling, and lacrosse.  Petitioner worked at Johnny Mac Sporting Goods, Douglas J, and had just been hired at Harrison Roadhouse.  (*Id.*, PageID.654-655.)  According to Shay, Petitioner was her best friend. Shay dated Singler for a little over two years, beginning in 2010.  In August of 2012, she moved into the apartment with Singler and Aho.  She knew Aho from work.  She was in love with Singler and considered him a best friend, and Singler was like a brother to Petitioner.  But she and Singler had verbal arguments and one physical argument in February 2012, in which Singler struck her hard in the stomach and then struck a wall.  She called 911, but she did not tell the police about Singler's violence, because she was embarrassed and did not want to break up with Singler.  (*Id.*, PageID.655-657, 669.)  She ended up being arrested for minor-in-possession.  (*Id.*, PageID.659.) Petitioner visited the apartment four or five times a week, and Singler, Petitioner, and she would watch television and smoke marijuana.  (*Id.*, PageID.657.)  Shay testified that she told Petitioner

about multiple arguments she had with Singler, and Petitioner would typically come over to the apartment to relieve the situation.  (*Id.*, PageID.658.)

On February 22, 2013, Shay went to work at the Harrison Roadhouse at noon. Singler drove her, because she had had two seizures in December 2012, and was not supposed to drive.  She was taking one anti-convulsant and transitioning to another.  At about 9:00 p.m., Singler showed up as she was finishing her work.  She had plans to go out with some friends and co-workers.  She and Singler had a beer before they left work.  She planned to meet at the home of Sarah McCarthy and Tyler Childs and go on to the Riv, a bar in East Lansing.  Singler drove her home first, so she could change her clothes.  (*Id.*, PageID.659-660.)  They left their house at 11:00 or 11:30 p.m. and arrived at Sarah and Tyler's house a few minutes later, parking in the driveway. The plan was to have a few cocktails before going to the bar.  After one shot, however, Shay had bad heartburn and went to the bathroom for a while.  (*Id.*, PageID.660.)  Singler was drinking from a pint of Jameson whiskey.  They walked to the bar at about 12:45.  She ordered a gin and tonic, and Singler ordered a pitcher of beer, which he drank himself.  Shay texted Singler that she had thrown up at 12:56 a.m.  They left the Riv about an hour later, planning to walk back to Sarah's house.  Because it was snowy and she was in heels, Shay asked Singler to give her a piggyback ride, which he did.  (*Id.*, PageID.661.)  At some point, Singler slipped, and Shay flew off of his back, landing with her back on a railroad tie.  When she began to cry, Singler became upset, and an argument started.  Singler asked for the car keys, but she did not have them.  The argument became more severe, and Shay decided not to go home with Singler.  She walked away, and subsequently called her manager, Matt Black, to get a ride, because she knew that Black would probably be leaving work in a cab.  Black arrived in a cab on Burcham Street, a few blocks from Sarah's house.  As she walked, Singler was calling and texting her.  Shay testified that she

11

answered the calls, but she did not remember if she answered the texts. (*Id.*, PageID.662.) The telephone calls were unpleasant. As she waited for Black, her telephone died, and Singler could not reach her. When she got to Matt Black's apartment, she charged her phone and texted Petitioner just after 2:00 a.m., saying that Singler had just broken one of her ribs, though she acknowledged at trial that the rib was not actually broken. She texted Petitioner again 45 minutes later to indicate that she was alright. (*Id.*, PageID.663.) At 2:49 a.m., Shay texted her brother that her boss had given her a ride back to his place because she had a broken back. She indicated that Singler had called her awful names over and over. Minutes later, Shay told Petitioner that Black had picked her up and she was staying with her friend Jordan Rex, who lived nearby, but she was really at Black's house. Shay testified that she lied about where she was because she did not want Singler to find out. Petitioner texted back immediately, asking if she wanted a ride either to her own place or to their mother's house. Shay texted that she was fine, but that she did not want to be with Singler, because he kept calling and screaming at her. (*Id.*, PageID.664.) Petitioner texted that Singler had called her names. Shay received two messages from Petitioner threatening to beat Singler up. Shay responded that she was all right, but thanked Petitioner for sticking up for her. (*Id.*, PageID.665.) Petitioner messaged that he was about to get into his car, find Singler, and beat him up. Shay, however, had stopped answering her phone. (*Id.*, PageID.666.) Shay's mother called at about 8:00 a.m. to tell Shay that Singler had been stabbed and that Petitioner had been arrested. Shay received a call from Singler's mother at about 8:30 a.m., informing her that Singler had died. Around that same time, Officer Squires called Shay to inquire about her well-being. She went to the police station at about 10:30 a.m., as soon as her father picked her up. (*Id.*, PageID.666-667.) Shay testified that she, Singler, and Petitioner were best friends, who could tell each other anything. She never saw Singler and Petitioner fight. (*Id.*, PageID.668.) When Singler drank, he

could get belligerent.  When Singler and Shay argued, one or the other often called Petitioner, who would come over to get things to cool down.  (*Id.*, PageID.669.)  Shay testified that Petitioner was easy going and that she never saw him get mad or push someone around.  (*Id.*, PageID.671.)

Randy McCowan, Petitioner's father, testified that Petitioner participated in football, lacrosse, and wrestling while in high school.  (*Id.*, PageID.673.)  Randy McCowan had known Singler for two years and loved him like a son.  Shay and Singler, however, had ups and downs in their relationship.  On the night of Singler's death, Petitioner lived with Randy and Judy McCowan.  Petitioner had stayed home from work, because he had a cold or the flu.  Randy fell asleep on the couch just before midnight, and Petitioner was still there.  (*Id.*, PageID.674.)  At some time on the morning of February 23, 2013, Petitioner came home and woke Randy, saying that he needed to talk to him.  Randy subsequently woke Judy.  Petitioner was coherent and had not been drinking, but he was frantic and upset.  (*Id.*, PageID.675; T. Tr. VI, PageID.686.)  Petitioner told Randy McCowan that he had gotten into a fight with Singler, that Singler had threatened to fight him and stab him, and that Petitioner had taken his folding knife out of the car when he went inside the apartment building.  Petitioner reported that he was hit three times in the head before he was grabbed by Singler.  Petitioner told Randy McCowan that he thought Singler was going to kill him, so he pulled the knife out of his pocket and cut Singler.  (T. Tr. V, PageID.675; T. Tr. VI, PageID.693.)  According to Randy McCowan, after Singler had been slashed with the knife, Tyler Aho told Petitioner to run.  (T. Tr. VI, PageID.692.)  Randy McCowan testified that he had not given a complete statement to the police, because he was trying not to say too much, in order to protect his son.  His son had a large goose egg on his forehead when Randy McCowan saw him.  (T. Tr. V, PageID.676.)  Randy McCowan saw another injury on Petitioner's neck.  McCowan also reported that Petitioner had previously had head injuries.  (T. Tr. VI,

PageID.690-691.)  Randy McCowan asked Petitioner what he had done with the knife.  Petitioner reported that he threw it out the window while driving down Lake Lansing Road between Hagadorn and Park Lake Road.  (T. Tr. V, PageID.677.)  Randy McCowan acknowledged that he did not call the police as soon as he heard about the fight, despite the seriousness of the possible injuries.  He and Petitioner drove to the apartment to see how Singler was doing, but discovered crime scene tape at the scene.  (*Id.*, PageID.678.)  They looked through the parking lot in an attempt to find Tyler Aho's vehicle.  (T. Tr. VI, PageID.687-688.)  Randy McCowan called his wife, attempting to figure out whether to go to the hospital or to the police.  His wife informed him that the police were there.  Randy advised his wife to tell the police that they were returning, and he and Petitioner then drove home.  When they arrived, Petitioner got out of the vehicle and was placed in custody, while Randy was asked to remain in the vehicle for ten or fifteen minutes.  (*Id.*, PageID.679; T. Tr. VI, 688.)  As Petitioner got out of the vehicle, Randy McCowan told him not to make a statement and that Randy would hire an attorney for Petitioner.  (*Id.*)  Randy McCowan wanted to speak with an attorney before talking to the police, but he was cooperative and permitted the police to search the house and his vehicle.  (T. Tr. V, PageID.679-680.)

At the close of the fifth day of trial, the court considered the prosecutor's motion to introduce both Petitioner's pre-arrest and post-arrest silence if Petitioner testified at trial.  The court, however, reserved judgment pending further research.  The court also reserved judgment on the admissibility of Petitioner's expert on the effects of a concussion.  (*Id.*, PageID.680-681.)

Michigan State Police Lieutenant Scott Hrcka testified as a fact witness and as an expert in fingerprint identification and crime scene investigation.  (T. Tr. VI, PageID.699.)  He was the crime scene coordinator for the incident.  He contacted the investigating detective and was told that a stabbing had occurred in unit 10, that the victim had been taken to the hospital, and that

14

police were speaking with a witness as well as a person of interest.  (*Id.*, PageID.699-700.)  Hrcka identified pictures of the scene and various evidence.  (*Id.*, PageID.700-708.)  Hrcka identified bloodstains on the walls and floors immediately outside the apartment, and inside the apartment. Investigators found a baseball cap on the floor of the hallway, as well as blood on the stairwell and railings.  (*Id.*, PageID.702-703, 708.)  Hrcka tested for fingerprints on the knife, but he could not find any, though he did turn the knife over to forensic scientist Heather Clark.  (*Id.*, PageID.705-706.)

Michigan State Police Forensic Scientist Heather Goff (formerly, Heather Clark) testified as an expert in DNA analysis, serology, and bloodstain pattern analysis.  (*Id.*, PageID.709-710.)  She swabbed the blade of the knife and Singler's fingernail clippings.  She also conducted serology testing on the various clothing items worn by Petitioner.  In addition, she checked the shower curtain for blood, but found none.  Only one item tested positive for blood:  the grey sweatpants allegedly worn by Petitioner.  (*Id.*, PageID.712, 714.)  Goff also conducted serology testing on the swabs taken from the driver's door handle of Petitioner's vehicle and the steering wheel, neither of which produced blood evidence.  She also completed DNA profiles from swabs taken from Singler and McCowan.  A mixture of both DNA profiles was found on the steering wheel of the vehicle.  (*Id.*, PageID.715, 717.)  Goff also testified concerning bloodstain patterns found at the scene.  Some showed arterial spurting and others showed gravitational dripping.  (*Id.*, PageID.717-720.)

On the morning of the seventh day of trial, the trial court reached its decision concerning the use of the tape showing Petitioner receiving his Miranda warnings and invoking his right to remain silent.  The court concluded that the prosecution could introduce the tape solely for the purpose of allowing the jury to understand Petitioner's state of mind, given that Petitioner

claimed to be confused after being struck in the head by Singler. (T. Tr. VII, ECF No. 7-14, PageID.726-727.) The court also refused to allow any further testimony concerning Petitioner's prior concussions. The court held that Petitioner would be allowed to testify concerning his own symptoms in relation to his prior concussion, but it would not allow testimony from the trainer that Plaintiff had experienced a concussion, as no diagnosis had been provided by a medical professional near the time of injury. The court indicated that it would take the testimony of Petitioner's expert, Dr. Watt, outside the presence of the jury. But the court would limit what Dr. Watt would say solely to what a concussion was and what some of the symptoms of a concussion typically were. (*Id.*, PageID.727-728.)

Meridian Township Police Sergeant Andrew McCready testified that he directed the investigation of Singler's death. McCready clocked the time it would have taken Aho to drive Singler from the apartment to the hospital at 15 minutes. (*Id.*, PageID.731.) McCready also testified that he found the police report concerning the incident from February 2012, when Shay McCowan alleged that she had called to report that Singler was assaulting her, but ended up arrested for being a minor in possession of alcohol. No information about an assault was included in the report. (*Id.*, PageID.732-733.) The court permitted the record to be admitted. (*Id.*, PageID.733.) McCready also testified that he had never intended to charge Aho for growing five or six marijuana plants, and he therefore had never reached a deal with Aho, though he advised Aho to get rid of the marijuana. (*Id.*, PageID.734.) He also testified that no calls were made to the police by Petitioner, Randy McCowan, or Shay McCowan in the hour and one-half between the 911 call and Petitioner's arrest. (*Id.*, PageID.735.)

After the prosecution rested, the court again took up the question of the admissibility of Dr. Watt's testimony that Petitioner's reported symptoms were consistent with his

16

having had a concussion.  The court held that, because no medical provider had confirmed a concussion at the time, the expert testimony was improper.  (*Id.*, PageID.748.)  The court also denied the defense motion for a directed verdict on the charge of first-degree murder.  (*Id.*, PageID.749-750.)

Judy McCowan testified about Singler's relationship with Shay, indicating that they had all liked Singler, but she had become concerned about Singler's anger with Shay when he was drinking.  (*Id.*, PageID.751-752.)  Judy testified that, on the day of the incident, Petitioner had been home sick from work and had spent most of the day on the couch.  She went to bed, but her husband fell asleep on the family-room couch, as did Petitioner.  At about 4:00 Saturday morning, her husband woke her.  Petitioner then told his parents that Singler had contacted him to say that Shay was missing and that Singler had gotten into an argument with Shay.  Petitioner told his parents that he contacted Shay, who was fine, but did not want to talk to Singler.  According to Petitioner, Singler began to badger Petitioner, calling him names.  At some point, Petitioner decided to go to Singler's house to talk to him.  When he arrived and went to the apartment door, Singler opened the door and immediately started punching Petitioner.  Petitioner told his parents that he thought he was going to be killed, and he got out his knife and cut Singler.  At that point, Aho told Petitioner to run.  Petitioner was very scared and worried and came back home and told his parents the story. Petitioner and his father then left to check on Singler's welfare.  Judy McCowan continued to try to call Singler.  At some point the police came to the house.  Randy called Judy to say that they did not see either Singler's or Aho's car at the apartment, but they had seen police tape, and he did not know whether to try the hospital or call the police.  Judy told Randy that the police were already at the house.  Randy told her to tell the police they were on their way.  (*Id.*, PageID.753.)  Judy McCowan also testified that she had seen Singler and Petitioner wrestle and roughhouse, with

Singler always ending up on top.  Petitioner was taller, but Singler was much more muscular and defined.  (T. Tr. VIII, ECF No. 7-15, PageID.773-774.)

Petitioner testified that he was 19 at the time of trial, and Shay was three years older.  After high school, he worked two jobs a total of about 40 hours a week.  (*Id.*, PageID.775-776.)  Petitioner met Singler in his junior year of high school, when his sister began dating Singler.  He and Singler became friends, seeing each other at least once a week.  They enjoyed watching sports, playing video games, and watching the same television shows and movies.  (*Id.*, PageID.781-782.)  They went to Higgins Lake together multiple times, and they sometimes went to Harrison Roadhouse together to eat and watch a game, while waiting for Shay.  (*Id.*, PageID.782.)  Petitioner testified that Singler's relationship with Shay was good, but they argued loudly over dumb things, especially when they were drunk.  (*Id.*, PageID.783.)  He would usually try to calm them down to get the fight over with.  He received such calls two or three times a month, always after midnight, from either Shay or Singler, wanting Petitioner to take one of them because they were arguing.  (*Id.*, PageID.784.)  On February 22, 2013, Petitioner did not go to work because he was sick.  He spent most of the day on the couch, watching television.  (*Id.*, PageID.785-786.)  He fell asleep wearing his Under Armour sweatpants and his Okemos football t-shirt -- the clothes produced by the prosecution.  (*Id.*, PageID.786.)  He was scheduled to work the following morning at 9:00 a.m., for which he usually got up at 7:00 a.m.  (*Id.*, PageID.786-787.)

At about 3:00 a.m., Petitioner was awakened by a call from Singler, which lasted about six minutes.  After the call, Petitioner texted Shay to find out if she was all right, or if she was walking aimlessly through campus and needed a ride home.  (*Id.*, PageID.787.)  She told him that she had a broken rib or hurt back, and shortly thereafter indicated that she was all right.

18

(*Id.*, PageID.788-789.)    In the interim, Petitioner wrote, "WTF," in concern about her. (*Id.*, PageId.789.)  She explained that her boss had driven her back to his place, and that she went to Jordan's house, which was nearby.  She also indicated that Singler had called her horrible names, and she did not know what to do.  Immediately thereafter, Singler wrote Petitioner asking where Shay was.  Petitioner told him that she was at her boss' house, not walking around anymore. Petitioner told Shay that he was going back to bed.  (*Id.*, 790.)  He then received a message from Singler saying, "Fine, f**k you, dude."  (*Id.*, PageID.791.)  Petitioner felt hurt, as he was just trying to help Singler, and he did not like that Singler had called his sister a bad name.  Had Singler asked, Petitioner would have picked him up at any time or would have gone to look for Shay.  (*Id.*, PageID.792-793.)  He wrote Shay, saying that he would knock Singler's teeth out.  Singler wrote in offensive language that Petitioner should not lecture him, because Shay was in the wrong.  (*Id.*, PageID.793.)  Petitioner wrote back that Singler should watch who he was talking to and that Petitioner would "whoop [Singler's] a**."  (*Id.*, PageID.793-794.)  And he wrote Shay, saying that he was going to get in his car and beat Singler.  (*Id.*, PageID.794.)  Petitioner wrote Singler,

> I offered you my undivided attention, and you f**king blew it.  You're going to have to working on a big apology if you don't want to be spitting up blood the next time I see you.  I don't – I don't give a f**k if you didn't mean sh*t.  You're a jackass.

(*Id.*, PageID.794.)  Petitioner testified that he felt like he did not deserve to be treated so badly when he was just trying to help.  (*Id.*, PageID.795.)  Singler responded, "[C]ome on, pussy, let's do this."  (*Id.*)  Petitioner responded that Singler would see when Petitioner showed up, and he taunted Singler to "[s]tay up long enough or else you bi*ched out."  (*Id.*)  Singler responded with a series of texts calling Petitioner "queer" and "fag."  (*Id.*, PageID.796.)  Additional messages continued, and Petitioner told Singler that he would be there in 20 minutes, after he got gas.  (*Id.*, PageID.796.)  Petitioner sent additional messages ten minutes and five minutes away from

Singler's apartment.  (*Id.*, PageID.798-799.)  Petitioner testified that, by the time he finished getting gas, he had calmed down and was no longer mad, but he wanted to talk to Singler and fix things.  (*Id.*, PageID.800, 802.)  Prior to Singler's messages of that evening, Petitioner considered himself to be best friends with Singler.  (*Id.*, PageID.802.)

When he arrived at the apartment complex, he saw the messages that Singler had left on his phone, which included threatening to kill Petitioner.  (*Id.*, PageID.801.)  After reading the message, Petitioner grabbed his folding Buck Knife, which he kept in the console of the car. He opened the blade and put it in his pocket, as he felt nervous and somewhat scared.  (*Id.*, PageID.802-803.)  Petitioner was buzzed into the building, and he climbed the stairs to the third floor.  After he walked one or two steps from the stairway, Petitioner saw both Aho and Singler in the doorway.  Aho was holding Singler back, and Singler was trying to get past, yelling, "[A]re we going to do this?  Is this going to happen?"  (*Id.*, PageID.804-805.)  Petitioner moved to face the apartment.  At that point he had nothing in his hand.  The next thing he knew, Singler pushed Aho aside and began punching Petitioner in the head.  He hit Petitioner in the left eyebrow, in the forehead, and on top of the head.  Petitioner said that he did not have time to raise his arms to defend himself.  (*Id.*, PageID.805.)  After the first punch, Petitioner saw a bright flash of light and felt disoriented.  (*Id.*, PageID.806.)  Petitioner's hat fell off when he was hit, and it was found in the middle of the hallway.  (T. Tr. VI, ECF No. 7-13, PageID.702-703, 708; T. Tr. VIII, ECF No. 7-15, PageID.806.)  Petitioner was terrified and had never seen Singler that angry.  Petitioner grabbed his knife to get Singler off of him.  Singler bent over, crossed his arms, and went back into the apartment.  Petitioner followed and saw Singler on the ground, bleeding.  (T. Tr. VIII, PageID.806-807.)  Petitioner turned and saw Aho, who put his hands up and said, "[D]ude, run." (*Id.*, PageID.807.)  Petitioner ran down the stairs to his car and drove home.  As he drove down

Lake Lansing Road, he threw the knife out the window.  He testified that he was panicked, disoriented, and had a really severe headache.  He went straight home.  Petitioner took his vest off in the laundry room.  He went into the bathroom and took a picture of himself in the mirror. (*Id.*, PageID.808.)  Petitioner then went into the family room, woke his father, and told his father and mother what had happened.  (*Id.*, PageID.809-810.)  Petitioner tried calling Aho, while the family was all together in the kitchen.  Petitioner testified that the phone records show that he had already called Aho five times while he was driving back to the house, but Petitioner did not remember making those calls or talking to Aho.  (*Id.*, PageID.810.)  Petitioner and his father then drove to the apartment complex and looked for Aho's car, but it was not there.  (*Id.*, PageID.811-812.)  After they turned around, Petitioner saw police tape by the front door of the complex. Petitioner and his father called his mother to say Aho and Singler were not there and that they saw police tape.  Based on the conversation with his mother, they drove back home.  When he got out of the car, a police officer asked where the knife was.  Following direction from his father, Petitioner responded that he would like to speak with an attorney.  (*Id.*, PageID.813.)  At this point, Petitioner still had a very bad headache, but he was no longer confused.  He also had bruising on his head, which was hurting.  (*Id.*, PageID.814.)  Petitioner was in jail when he learned that Singler had died, and he was devastated.  (*Id.*, PageID.815.)  Petitioner testified that he went to the apartment to try to calm things down and that he never intended to hurt Singler or to kill him.  (*Id.*, PageID.816.)

The court placed on the record the rulings it made during Petitioner's testimony to deny the admission of the contents of Singler's phone conversation, to deny evidence that Petitioner had gone to a prior residence to calm a fight, and to deny counsel's request to ask about other times Petitioner had experienced a flash of light.  (*Id.*, PageID.817-818.)  The court also

declined to allow testimony concerning Singler's history of fighting and aggression. (*Id.*, PageID.817, 822.) Most of the determinations turned on the court's conclusion that they were not relevant because Petitioner had elected to go to the apartment, knowing that a fight was possible, and had armed himself with a knife. (*Id.*, PageID.817-824.)

The following day, the court held that it had not intended to restrict Petitioner from testifying about both a football head injury and a lacrosse head injury in his senior year of high school. It therefore allowed defense counsel to reopen direct examination on the second injury. (T. Tr. IX, ECF No. 7-16, PageID.828, 830.) The court also addressed Petitioner's objection to the prosecutor's introduction of a video of Petitioner at the police station, leading up to his second invocation of rights. The court held that the video could be used solely to impeach Petitioner's state-of-mind testimony. In addition, the court allowed introduction of the video, because Sgt, McCready informed Petitioner that he was conducting a homicide investigation, to impeach Petitioner's claim that he did not know that Singler had died until informed by his mother. (*Id.*, PageID.829.) Defense counsel lodged a continuing objection to the court's rulings, particularly with respect to the admission of any video after Petitioner first invoked his right to counsel at the time of his arrest. (*Id.*, PageID.829-830.) Petitioner then testified that he had a football head injury in his senior year that caused him to see a bright flash of light, causing him to be so confused that his parents picked him up. The injury gave him severe headaches for days. (*Id.*, PageID.831.) Later that senior year, he had another head injury during lacrosse practice that again caused a flash of light and confusion that he recognized from the earlier injury. (*Id.*, PageID.831-832.)

Twice during cross-examination, the prosecutor attempted to question Petitioner about what he had not told the police, including that it was self-defense and that he had a headache and felt dizzy. Both times defense counsel objected. The court twice instructed the jury that

evidence about what Petitioner said or did not say after asking for an attorney were not permitted, because Petitioner had exercised his right to counsel.  (*Id.*, PageID.846-847.)  The prosecutor played the videotape of Petitioner at the beginning of Sergeant McCready's interrogation, introducing himself and asking how Petitioner is, with Petitioner's response that he is "good."  (*Id.*, PageID.847.)  No instruction was given the jury at that time.  The recording edited out the *Miranda* warnings.  (T. Tr. X, ECF No. 18, PageID.863.)

Neuropsychologist Douglas Watt testified in a proffer, outside the presence of the jury, about the nature of concussions, which are an altered mental status following a blow to the head or an acceleration or deceleration of the head.  He also testified that a grade one concussion is an altered or confusional state lasting less than 15 minutes.  Grade two means the confusional state lasts more than 15 minutes, and grade three means there is a loss of consciousness.  A confusional state can cause disorientation, disorganization, and variable awareness of their environment.  The state ranges in severity from person to person.  (*Id.*, PageID.851.)  Dr. Watt indicated that no objective means exists for diagnosing whether a concussion occurred.  Even an MRI only indicates abnormalities that may or may not have been caused by a concussion. Instead, concussion is diagnosed by interview and reported symptoms.  Also, people often cannot hold things in mind, but they may be able to do routine tasks without impairment.  Headaches are almost universal, and nausea is common, as are visual alterations, such as bright lights.  (*Id.*, PageID.852.) Watt testified that a blow to the head in a fistfight could cause a concussion.  Not everyone who is confusional looks dazed.  (*Id.*, PageID.853.)  At the end of the proffer, the court denied Petitioner the right to present the evidence, because no doctor had diagnosed Petitioner with a concussion. (*Id.*, PageID.854-857.)

The court also ruled that Petitioner's trainer, Michael Johnston, could testify about what happened at the time Petitioner had the football head injury, but Johnston would not be permitted to mention the existence of a concussion.  In addition, the court excluded the testimony of Olivia Sherman about her visits to the apartment during arguments and fighting between Shay and Singler.  The court also ruled that, while Shay could testify about Petitioner's relationship with Singler, she could not testify about his going over to fix things when Shay and Singler fought. (*Id.*, PageID.856.)  Further, the court ruled that the paramedic could not testify about what services could have been provided if an ambulance had been called.  The court reiterated that Dr. Watt could not even testify that persons with confusion from a concussion may not look confused, particularly one and one-half hours after the injury.  (*Id.*, PageID.857.)

Witnesses Olivia Sherman and Karen Jordan testified about Petitioner's character as honest, caring, helpful, and a peacemaker.  (*Id.*, PageID.858-860.)

The trial court expressly disallowed an instruction explaining the defense's failure to produce an expert on concussions, as promised in the opening.  The court also disallowed an instruction that there might be more than one cause of death, based on the theory that Aho's decision to carry Singler down the stairs to the parking lot and then to drive him to the hospital without calling an ambulance might have prevented Singler from receiving life-saving care.  The court ruled that no evidence had been introduced to refute Dr. Mosher's testimony that calling an ambulance would not have been more likely to save Singler's life, and the court had been unwilling to admit the testimony of a paramedic for the defense.  The Court also refused to give an instruction on involuntary manslaughter, though it would give the voluntary manslaughter charge.  (T. Tr. X, ECF No. 7-17, PageID.863-867.)

24

Michael Johnston testified that he was an athletic trainer at Okemos High School in the 2011-2012 academic year, when Petitioner had a head injury during football, causing Petitioner's parents to be called. Johnston testified that Petitioner had a concussion, but the court struck the testimony. Johnston spoke with Petitioner's father, instructing him to watch Petitioner for symptoms. Under school rules, a student could not play until he was symptom free for 48 hours. (*Id.*, PageID.869.)

On rebuttal, the prosecutor called Singler's former girlfriend, Mia Deagonstino, who testified that Singler had never been physically violent and was a peacemaker. On cross-examination, she acknowledged that Singler used threatening language. (*Id.*, PageID.869-871.)

In the jury instructions, the court instructed the jury that the prosecutor's evidence of Petitioner's pre-arrest silence could not be used as substantive evidence of his guilt. The court also instructed that a witness does not have an obligation to contact the police. (*Id.*, PageID.899.) The court further instructed the jury on the defense of self-defense and instructed that it was the prosecutor's burden to disprove Petitioner's defense. (*Id.*, PageID.901.)

After seven hours of deliberations, the jury found Petitioner not guilty of first-degree murder, but guilty of second-degree murder. (T. Tr. XI, ECF No. 7-18, PageID.909.) At a hearing held on November 6, 2013, the court sentenced Petitioner at the top of the guidelines range to a prison term of 20 to 60 years. (Sentencing Tr., ECF No. 7-19, PageID.916, 924.)

Petitioner appealed his conviction to the Michigan Court of Appeals, raising the two issues presented on habeas review, together with a sentencing issue not raised in this Court. In an unpublished opinion issued on June 9, 2015, the court of appeals affirmed the conviction and sentence. The court of appeals concluded that Petitioner's knowledge of the victim's prior fights with others was admissible to support Petitioner's claim that he was in fear of his life. However,

the court found that the trial court's error in excluding the evidence was harmless, as the jury was presented with evidence that the victim was, in fact, acting aggressively on the night of the incident.  (Mich. Ct. App. Op., ECF No. 7-20, PageID.930.)

Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same three issues.  The Supreme Court denied leave to appeal on February 2, 2016.  (Mich. Ord., ECF No. 7-21, PageID.1170.)

Petitioner, through counsel, filed the instant habeas petition on November 9, 2016.

II.    AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135

26

S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.     Ground I:  Right to present a defense

Petitioner contends that he was denied his right to present a defense when the trial court prohibited him from presenting evidence, including expert testimony, concerning head injuries.  He also alleges that he was denied his right to present a defense when the trial court refused to allow evidence of the character of the victim for aggression.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted).  However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).  The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."  *Crane,* 476 U.S. at 689.  The Supreme Court gives trial court judges "wide latitude" to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues.  *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).  Finally, rules that exclude evidence from criminal trials do not violate the right to present a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer,* 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas,* 483 U.S. 44, 56 (1987)).

Moreover, under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect.  Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F.3d 507, 511–12 (6th Cir. 2003).

A.    Expert testimony on concussions

Petitioner first claims that the trial court had violated his right to present a defense when it refused to allow Dr. Douglass Watt to testify either that Petitioner likely had suffered a concussion or that concussions typically affect an individual's behavior and memory in a variety of ways.  The Michigan Court of Appeals carefully considered the issue, as follows:

Generally, a defendant has a constitutional right to present a defense, but this right is not absolute.  The defendant must still comply with established rules of evidence and procedure, *People v Kowalski*, 492 Mich 106, 139; 821 NW2d 14 (2012), including the requirement that the evidence the defendant wants to introduce is relevant, *People v Hackett*, 421 Mich 338, 354; 365 NW2d 120 (1984). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  MRE 401.  Generally, all relevant evidence is admissible and irrelevant evidence is inadmissible. MRE 402.  However, relevant evidence still may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  MRE 403.

Defendant first argues that the trial court erred when it refused to allow him to present the expert testimony of Douglass Watt, Ph.D., in order to educate the jury on the complexities of various types of head injuries and the impact they can have on an individual's perception.  Watt proposed to testify about the gradations of concussive injuries and the myriad of effects a concussion could have on an individual's behavior and memory.  In particular, defendant sought to have Watt testify that defendant's claim that he saw a bright flash of light after being struck in the head by the victim could be a sign that defendant had suffered a concussion. Further, Watt would have testified that concussions result in people being in a "confusional state," where they have a difficult time assessing situations and

29

reacting appropriately. Defendant claims that this would have helped the jury understand that defendant held an honest and reasonable belief that he was in imminent danger.

The trial court concluded that the testimony was inadmissible because its underlying premise—that defendant had suffered a concussion at the time of the incident—was speculative. The trial court relied on the fact that there never was any diagnosis of defendant having been concussed at the time of the incident. And since there was no evidence of a concussion, the court believed that Watt's testimony about concussions would have unduly influenced the jury into believing that defendant had been diagnosed with a concussion.[1] Although not cited by the trial court, its ruling was based on MRE 403, which bars marginally probative evidence when that "evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). It is well established that the trial court is in the best position to make MRE 403 determinations on the basis of "a contemporaneous assessment of the presentation, credibility, and effect of testimony." *People v VanderVliet*, 444 Mich 52, 81; 508 NW2d 114 (1993).

First, the trial court did not err by prohibiting Watt from testifying regarding whether defendant had indeed suffered a concussion. By Watt's own testimony, he could not determine whether defendant had suffered a concussion as a result of being struck by the victim. Watt explained that concussions are diagnosed by reported symptoms and a clinical assessment "at or near the time" of the incident. Watt did not examine defendant until six months after the incident, and no one else had treated defendant for a concussion. Thus, the trial court did not err when it found that Watt could not properly opine that defendant suffered a concussion during the altercation.

Second, the trial court also did not abuse its discretion in prohibiting Watt from testifying regarding the nature of concussions in general. Defendant is correct that his state of mind was an important element of establishing self-defense. To succeed on a claim of self-defense, defendant must establish that he honestly and reasonably believed that he was in danger of death or serious bodily harm. MCL 780.972(1)(a); see also *People v Heflin*, 434 Mich 482, 502, 509; 456 NW2d 10 (1990); *People v George*, 213 Mich App 632, 634-635; 540 NW2d 487 (1995). This Court has held that, in this context, reasonableness "depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011); see also *People v Bynum*, 496 Mich 610, 638; 852 NW2d 570 (2014) (stating that a defendant's belief must be both subjectively honest and *objectively* reasonable) (YOUNG, C.J., concurring in part and dissenting in part). This Court has stated that "[a] defendant's psychological idiosyncrasies may, at least in theory, be relevant to the reasonableness of the defendant's belief that he or she was in danger." *Orlewicz*, 293 Mich App at 102. For argument's sake, in light of the fact that a concussion could impact a person's mental state, Watt's testimony, assuming

a proper foundation was provided, could be considered relevant under MRE 401. But this does not address the trial court's concern that the discussion of concussions was potentially confusing to the jury because it was never established that defendant was under the effect of a concussion when he stabbed the victim. Therefore, we cannot conclude that the trial court abused its discretion by precluding Watt from testifying under MRE 403.

[1] The trial court noted that with no way to verify whether defendant had suffered a concussion during the fight, introducing expert testimony on the matter of concussions "adds a different tenor."

(Mich. Ct. App. Op., ECF No. 7-20, PageID.927-928.)

The determination of the state court is neither contrary to nor an unreasonable application of clearly established precedent of the Supreme Court.  The Supreme Court has never held that a state court deprives a criminal defendant of his right to present a defense by excluding expert testimony.  *Martin v. Warren*, No. 14-cv-10642, 2017 WL 564351, at *3 (E.D. Mich. Feb. 13, 2017).  Moreover, "only rarely ha[s] [the Supreme Court] held that the right to present a complete defense was violated by the exclusion of any sort of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).  As the *Jackson* Court reiterated, those circumstances were limited to occasions on which the trial court had applied a per se rule of exclusion or applied a rule in a disproportionate fashion.  *Jackson*, 133 S. Ct. at 1992 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324-325 (2006); *Rock v. Arkansas*, 483 U.S. 44, 56-57 (1987,; *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); and *Washington v. Texas*, 388 U.S. 14, 22-23 (1967)).  Indeed, in *Jackson*, the Supreme Court, on habeas review, expressly cautioned courts sitting on habeas review against applying the general right to present a defense to circumstances not previously addressed by the Supreme Court.  The *Jackson* Court expressly overruled the Ninth Circuit's grant of habeas relief, finding that the circuit court had too broadly construed the general right to present a defense when it found that the state court erred in refusing

to admit extrinsic evidence of the accuser's prior sexual assault complaints.  *Jackson*, 133 S. Ct. at 1994.

In the instant case, Petitioner does not challenge the application of an arbitrary rule or a rule that lacks a significant basis. Instead, as in *Jackson*, Petitioner attempts to expand the right to present a defense to mandate the admission of the expert evidence desired by the defense. On numerous occasions, courts in the Sixth Circuit have denied habeas relief when expert defense witnesses were not permitted to testify.  *See Miskel v. Karnes*, 397 F.3d 446, 453-55 (6th Cir. 2005) (holding that no clearly established law mandated the petitioner's right to present expert testimony on the accuracy of breathalyzers); *Neff v. Yukins*, 106 F. App'x 979, 980 (6th Cir. 2004) (affirming denial of habeas relief based on the state court's exclusion of expert testimony on battered woman's syndrome); *Wong v. Money*, 142 F.3d 313 (6th Cir. 1998) (holding that an Ohio rule barring expert psychiatric testimony to show diminished capacity did not abridge the right to present a defense, because it did not preclude the defendant from introducing factual evidence or testifying in her own behalf); *Martin*, 2017 WL 564351, at **2-3 (denying habeas relief and holding that excluding expert testimony on post-traumatic stress syndrome . . .does not violate the right to present a defense); *Shorling v. Warren*, No. 2:08-cv-13261, 2010 WL 2595328, at **6-7 (E.D. Mich. June 24, 2010) (denying habeas relief based on the ground that the trial court excluded expert testimony on teenage bullying and its effect on the ability to form specific intent to murder). The instant case is distinguishable from *Ferensic v. Birkett*, 501 F.3d 469, 481-82 (6th Cir. 2007), which held that the refusal to allow an eyewitness-identification expert to testify impacted a "weighty" interest of the accused, because in *Ferensic*, the only evidence against the defendant was the eyewitness identification of the victims.[1] Here, in contrast, the expert's testimony was not

---

[1] The Court notes that, while the *Ferensic* court held that exclusion of the expert's testimony violated the petitioner's right to present a defense, the court denied habeas relief because the error was harmless.  501 F.3d at 482.

related to the central issue of Petitioner having killed Singler, or even to the defense of self-defense, as Petitioner himself testified to being hit in the head (which was corroborated by Aho), and other evidence about Petitioner's motivation was introduced at trial. *See Jackson v. Bradshaw*, 681 F.3d 753, 762 (6th Cir. 2012) (holding that failure to produce eyewitness identification expert was not ineffective assistance of counsel, distinguishing circumstances from those in *Ferensic*).

As the court of appeals observed, the trial court applied a general balancing rule of evidence and determined that the expert witness' testimony was unduly speculative and would introduce undue confusion for the jury. The court of appeals also correctly noted that, while excluding the expert testimony, the trial court admitted Petitioner's own description of his head injury and resulting symptoms, as well as evidence of prior circumstances in which he had been injured and experienced the same symptoms. While this Court might have reached a different conclusion at trial regarding the relevance and significance of the expert's testimony, it is not for this Court to rebalance the evidentiary considerations reached by the trial court, but only to correct constitutional error. The state court's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

B.      Admission of evidence of head injuries before 2011

Petitioner also argues that he should have been permitted to introduce evidence, not just of the concussions that occurred in 2011 and 2012, while he was in high school, but also of incidents preceding 2011. The trial court held that the earlier incidents were not relevant because they were too remote in time. The court of appeals affirmed, but also concluded that any error was harmless.

To the extent that Petitioner bases his argument on Rule 404(a)(2) of the Michigan Rules of Evidence, his claim is not cognizable on habeas review. The extraordinary remedy of

habeas corpus lies only for a violation of the United States Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard.  The Supreme Court has never held that a defendant has a constitutional right to introduce evidence of the victim's reputation for violence.  Moreover, Petitioner cannot demonstrate that he was deprived of his right to present a defense by the exclusion of the pre-2011 injuries, as he was permitted to testify to and introduce

34

extrinsic evidence of his two later head injuries.   Therefore, the trial court provided ample opportunity for Petitioner to present the head-injury portion of his self-defense claim.

Further, on habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness.  *See Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112, 120-21 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.  Here, the state court considered the issue of harmless error, concluding that any error was harmless.  That conclusion was patently reasonable, as it is virtually impossible to conclude that evidence of additional incidents of head injury would have had a substantial and injurious effect on the verdict.

For both reasons, Petitioner is not entitled to habeas relief.

### C.    Limitation on evidence of victim's reputation for violence

Petitioner argues that he was improperly denied the ability to explore Singler's propensity for violence.  Petitioner first argues that Rule 405(a)(2) of the Michigan Rules of Evidence specifically allowed him to introduce specific evidence of conduct showing the victim's character for aggression.   He secondarily argues that the failure to allow introduction of the evidence deprived him of his right to present a defense.

The Michigan Court of Appeals held that evidence of Singler's reputation for aggressive character was admissible.  The court held that, under the rule, evidence of specific aggressive conduct was not admissible to show that Singler was the initial aggressor in the fight, but would have been admissible to show that Singler's prior actions may have reasonably caused

Petitioner to be apprehensive of Singler. (Mich. Ct. App. Op., ECF No. 7-20, PageID.929.) While the court of appeals found that the evidence should have been admitted, it concluded that the failure to admit the evidence was harmless, because, even absent the evidence, the jury was aware that Singler had been aggressive on the night in question; as a result, the jury's knowledge of Singler's reputation likely would have had no impact on the verdict. In addition, the court held, Petitioner had failed to make an offer of proof, the extent of the error was not properly preserved for review. Finally, the court held that, because the jury was presented with evidence that the victim was aggressive on the night of the fight, Petitioner was not denied his right to present a defense.

As previously discussed, Petitioner is not entitled to relief on the basis of a state evidentiary error. *Estelle*, 502 U.S. at 68. Further, as discussed, the Supreme Court has never held that a defendant has a constitutional right to introduce evidence of the victim's propensity for aggression and violence, nor has it held that the failure to permit such evidence violates a defendant's right to present a defense. Moreover, as the court of appeals recognized, the jury was made aware of Singler's aggressiveness in striking Shay and his aggressiveness on the night in question, both through the threats he issued and through the evidence that Singler attacked Petitioner first. As a result, the court of appeals reasonably concluded that the exclusion of evidence about Singler's aggressiveness was harmless error.

IV.    Ground II:  Prosecutorial Misconduct

In his second ground for relief, Petitioner argues that the prosecutor committed misconduct by improperly commenting on his right to remain silent and his right to request the assistance of counsel. Petitioner raises concerns about three separate types of evidence, though he substantially conflates those claims. First, he suggests that the prosecutor improperly used evidence about Petitioner's silence prior to his arrest at his home. Second, Petitioner claims that

36

the prosecutor improperly used his silence after his pre-*Miranda*[2] invocation of counsel at the time of his arrest as substantive evidence of guilt.  Third, Petitioner asserts that the prosecutor improperly used his silence after he had been given warnings.  Petitioner argues that the prosecutor improperly used the same types of silence to impeach his credibility.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) (holding that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel).

'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (internal quotation omitted).

The Michigan Court of Appeals addressed Petitioner's claim of prosecutorial misconduct, as follows:

> Defendant next raises a number of challenges to the introduction of evidence and prosecutor commentary, which he deems were violative of his Fifth Amendment right to remain silent.  We note that while defendant conflates questions, testimony, or commentary involving his silence in his claim that the prosecutor committed misconduct, it is clear from the testimony that no inadmissible evidence was introduced; nor were the prosecutor's comments improper.  Defendant presents a detailed argument concerning why evidence and commentary on his silence following his initial request for an attorney while at his home should be treated similarly to the more frequently analyzed impermissible use of post-arrest, post-*Miranda* silence.  See, e.g., *People v Shafter*, 483 Mich 205, 214; 768 NW2d 305 (2009).  However, defendant fails to acknowledge that the trial court did, in fact, decide to foreclose all commentary and testimony concerning his silence after he invoked his right to speak with an attorney and repeatedly ruled that any evidence concerning same would not be admissible.  The trial court thus treated defendant's pre-invocation silence differently from his post-invocation/post-arrest silence.

> The trial court's decision to allow evidence and commentary concerning defendant's actions prior to his decision to invoke his right to an attorney was not erroneous.  See *People v Sutton (After Remand)*, 436 Mich 575, 579-580; 464 NW2d 276 (1990).  For the most part, the prosecutor followed the trial court's direction, with one exception where the prosecutor questioned defendant concerning any claims he had made to officers while in custody concerning his medical condition.  At that time, the trial court sustained defendant's objection, struck the testimony, and provided a limiting instruction.  In other instances, the trial court also repeatedly provided proper limiting instructions.  And the prosecutor did not impermissibly comment during opening statement or closing argument about any post-invocation silence.  Instead, the comments were limited to a claim

38

that, if defendant's version of the events were true, he should have immediately told the police what had occurred or should have done so when he first left his vehicle arriving back home with his father.  The closest the prosecutor came to committing error was when he stated:

> He is sitting there, calm as can be, not crying, not emotional, and not putting his head in his hand, rubbing his head.  Never told anybody at that point that he was dazed, confused, head hurts.  In fact, when Sergeant McCready walk in and says:  How are you doing. What's he say?  Doing good, sir. Doing good.  Wouldn't that be the time to tell somebody that my head hurts, that I'm dizzy, that I'm dazed, and I'm confused?  He didn't lie, because he didn't have the symptoms.

This comment was not in regard to defendant's *silence*—instead, it was about how defendant's statement that he was "doing good" would be contrary to someone who was suffering from a concussion or head injury.

> Consequently, because none of defendant's alleged instances of prosecutorial misconduct was established, he is not entitled to relief.  We also note that the trial court mitigated any improperly injected prejudice when it instructed the jury that it could not use any evidence of silence, even that which occurred prior to his arrest, as substantive evidence of guilt.  "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).  Finally, given the strong eyewitness evidence against defendant and the other admissible evidence concerning the lack of any visible effect from the victim's alleged assault, we find that any misconduct would not have been outcome determinative.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.930-931 (footnote omitted).)

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ."  The Fifth Amendment's right to silence applies to a defendant in a state court proceeding under the Fourteenth Amendment. *Griffin v. California,* 380 U.S. 609, 615 (1965) (barring use of a defendant's refusal to testify at trial as substantive evidence of guilt).  In general, a defendant's decision to remain silent cannot be used as substantive evidence of guilt. *Id.*  This rule clearly applies to a defendant's silence after the defendant has been advised of his rights and actually invokes the right to remain silent. *See id.*; *cf. Doyle v. Ohio,* 426 U.S. 610, 619  (1976) (precluding the use for impeachment

purposes of a defendant's post-*Miranda* silence).  However, as the Sixth Circuit has observed, "'[t]he constitutionality of using a defendant's pre-*Miranda* silence as substantive evidence of guilt [has] not been addressed by the Supreme Court.'"  *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009) (quoting *Jones v. Trombley,* 307 F. App'x 931, 933 (6th Cir. 2009)).  The circuit courts have split on the issue of the admissibility of pre-*Miranda* silence as substantive evidence of guilt.  *See Combs v. Coyle,* 205 F.3d 269, 282-83 (6th Cir. 2000) (collecting cases).  In *Combs*, the Sixth Circuit, sitting on habeas review, held that the use of a defendant's post-arrest, pre-*Miranda* invocation of counsel as substantive evidence of guilt violates the Fifth Amendment.  *Id.* at 283.  As the Sixth Circuit recognized in *Hall*, however, *Combs* was decided under a pre-AEDPA, de novo standard of review.  *Hall*, 563 F.3d at 232 (citing *Combs*, 205 F.3d at 283).  As a result, the *Hall* court held, *Combs* is not controlling law for federal courts sitting on habeas review after the AEDPA.  *Hall*, 563 F.3d at 232; *Hereford v. Warren,* 536 F.3d 523, 532 (6th Cir. 2008); *Jones,* 307 F. App'x at 934 n.1.  As a result, as decided in *Hall*, it is not clearly established by the Supreme Court that the substantive use of both Petitioner's pre-arrest and his post-arrest, pre-*Miranda* silence violated his right to silence.

Moreover, the prosecutor's use of Petitioner's pre-arrest and pre-*Miranda* silence to impeach Petitioner was proper.  Petitioner, argues that, because he invoked his right to counsel and thereby his right to silence, the Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610 (1976), barred the use of his silence for impeachment purposes.  In *Doyle*, the Supreme Court considered whether a defendant's silence during a custodial interrogation could be used, not as evidence of guilt, but to impeach the defendant's testimony at trial.  The Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  *Id.* at 619.  The theory

underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618. On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.*

Here, however, although Petitioner unquestionably was placed under arrest as soon as he got out of his father's car, he was not instructed about his rights under *Miranda*, because he immediately invoked his right to counsel. The Supreme Court has declined to extend *Doyle* to circumstances other than post-*Miranda* exercises of silence. *See, e.g., Salinas v. Texas*, 133 S. Ct. 2174, 2179-80 (2013) (holding that pre-arrest, pre-*Miranda* silence may be used to impeach a witness unless the witness had expressly invoked his right to silence); *Jenkins v. Anderson*, 447 U.S. 231, 236 (1980) (concluding that pre-arrest silence may be used to impeach a defendant's credibility at trial). Moreover, in *Fletcher v. Weir*, 455 U.S. 603, 605-06 (1982), the Court expressly held that post-arrest, pre-*Miranda* silence can be used to impeach a criminal defendant's subsequent testimony at trial, because the government did not induce the defendant to remain silent by giving the *Miranda* warning. The Court explained that *Doyle*'s prohibition on the use of post-arrest silence to impeach was based, not on the Fifth Amendment right to silence, but solely on the fact that affirmative assurances had been given in the *Miranda* warnings. *Id.*; *see also Brecht*, 508 U.S. at 628 (citing *Fletcher* and upholding use of a defendant's post-arrest, pre-*Miranda* silence).

Under these authorities, Petitioner is not entitled to habeas relief on his claims that the prosecutor had improperly impeached him on the basis of his post-arrest, pre-*Miranda* silence,

or improperly used that silence as substantive guilt, because neither is contrary to or an unreasonable application of established Supreme Court precedent.

Moreover, even if the law proscribed the use of pre-*Miranda* silence for any purpose, the facts belie Petitioner's claim that errors by the prosecutor amounted to prosecutorial misconduct under the standard established by the Supreme Court in *Darden*, 477 U.S. at 181, *Young*, 470 U.S. at 11-12, and *Donnelly*, 416 U.S. at 646-47.  Despite arguing that the prosecutor impermissibly questioned witnesses about his post-arrest silence in the government's case in chief, Petitioner fails to mention whether such questions were permitted and, if so, what actions were taken by the court in response to the allegedly improper comments.  An evaluation of those circumstances demonstrates either that no error occurred or that such error was cured by instruction and was insufficiently prejudicial to rise to the level of prosecutorial misconduct.

Petitioner first contends that the prosecutor elicited testimony from the arresting officer, Officer Squires, that Petitioner had not mentioned the altercation when Squires asked Petitioner to step out of his father's vehicle, before Petitioner's arrest.  The prosecutor also elicited Squires' testimony that Petitioner had not claimed at that time to be in fear of his life or acting in self-defense.  (T. Tr. III, ECF No. 7-10, PageID.589.)  When asked if he had inquired of Petitioner whether the knife used in the altercation was his, Squires informed the jury that Petitioner wanted to talk to a lawyer.  (*Id.*, PageID.590.)  At this juncture, however, the trial court sua sponte instructed the jury that Petitioner had an absolute right to ask for an attorney before speaking with the police.  (*Id.*)  Thus, the prosecutor made no attempt to use Petitioner's silence after he had invoked his rights.  The questions were directed solely at the time preceding Petitioner's arrest. To the extent Squires provided an improper answer to the prosecutor's question, the answer was neither solicited nor allowed to stand.  The court of appeals reasonably concluded that the mention

did not amount to prosecutorial misconduct under the factors cited in *Young*, 470 U.S. at 11-12,

because the prosecutor did not err and the instance did not deprive Petitioner of due process.

Petitioner next complains that the prosecutor improperly asked Officer Wicks if

Petitioner had mentioned his injuries at the time of booking.  (*Id.*, PageID.594.)  Defense counsel

objected to the question.  The court struck the prosecutor's question about whether Petitioner had

asked for medical attention and further instructed the jury that the questions being asked by the

prosecutor were not relevant, because Petitioner had already requested an attorney:

> THE COURT:  The issue before the jury is that Mr. McCowan had requested an attorney, said he wanted to remain silent, which has been acknowledged by the police department.  They stopped their questioning. Therefore, these questions would not be required to give an answer.   And, therefore, the Court has deemed that really isn't relevant because he already exercised his right to request an attorney, and hasn't had an opportunity to talk to the attorney yet.

(*Id.*, PageID.595.)  As a result, the trial court once again immediately corrected the prosecutor's

improper question and instructed the jury about Petitioner's rights.  Under these circumstances,

any error by the prosecutor was immediately cured by the court.

Petitioner next complains that the prosecutor improperly introduced a portion of the

tape showing the time around his advisement of rights at the police station, which included

Petitioner telling Detective McCready that he was "doing good."  The video evidence was admitted

to demonstrate two matters of impeachment:  (1) that Petitioner did not appear confused and

overwrought as he arguably claimed, and (2) that he was aware from the time he was taken in to

the station that Singler had died.  As discussed, the evidence was admissible for those purposes.

*See Fletcher*, 455 U.S. 605-06.  In addition, the prosecutor's conduct cannot be faulted, because

the trial court permitted introduction of the video evidence and the video did not include that

portion of the tape showing the delivery of rights or showing that Petitioner waived his rights.  (T.

Tr. X, ECF No. 7-17, PageID.863.)  Petitioner cannot demonstrate that the prosecutor committed

misconduct by offering evidence that ultimately was admitted at trial.  "'A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.'"  *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 1999) (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)); *see also Bales v. Bell*, 788 F.3d 568, 577 (6th Cir. 2015).

Petitioner also complains that the prosecutor's cross-examination of Petitioner included a number of questions about Petitioner's failure to call the police and failure to tell them about his injuries during the pre-arrest, pre-*Miranda* period.  After the prosecutor's third question, defense counsel objected and asked to approach the bench.  The court, in recess, instructed the prosecutor that no further questions would be allowed, as Petitioner had exercised his right to silence.  (T. Tr. IX, ECF No. 7-16, PageID.846.)  The prosecutor's impeachment of Petitioner about his failure to call the police or to tell the police of his injuries during the hour-and-a-half before his arrest was entirely proper.  *Jenkins*, 447 U.S. at 236.

Shortly thereafter, the prosecutor questioned Petitioner about not requesting medical attention when he was arrested.  After a prompt objection and off-the-record discussion, the court instructed the jury to disregard the last answer, stating:

> THE COURT:  Jury, I am going to instruct you to disregard that last answer, because he has the right to remain silent.  The fact that he may not have said things about his condition once he exercised his right cannot be utilized.  I know it's difficult, but you have to strike that.  Pretend like it didn't happen.

(*Id.*, PageID.847.)  The court squarely disallowed the prosecutor from using Petitioner's pre-arrest silence and post-arrest, pre-*Miranda* silence as substantive evidence of his guilt.  (*Id.*, PageID.899.) Even if such a question were improper, which I already have concluded it was not, it was thoroughly cured by the court's response.  Petitioner therefore cannot demonstrate that the prosecutor committed misconduct under all of the circumstances.  *See Young*, 470 U.S. at 11-12.

In sum, the Michigan Court of Appeals' rejection of Petitioner's claim of prosecutorial misconduct was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Petitioner therefore is not entitled to habeas relief on his second ground for habeas relief.

## Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken. 28 U.S.C. § 2253(c)(1). A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could conclude that this Court's denial of Petitioner's first ground for relief is debatable or wrong. I therefore recommend granting a certificate of appealability on Petitioner's claim that he was denied his right to present a defense.

45

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be granted as to Ground I.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated: January 17, 2018                    /s/ Ellen S. Carmody
                                           Ellen S. Carmody
                                           United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).